UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

|  |  |
|---|---|
| The National Organization for Marriage, Inc., | * * * * |
| Plaintiff, | * * |
| v. | * Civil No. 13-cv-1225-JCC/IDD |
| | * |
| The United States of America, Internal Revenue Service, | * * |
| | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \*

## THIRD-PARTY WITNESS MATTHEW MEISEL'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

Plaintiff, the National Organization for Marriage (hereinafter "NOM") has moved to compel the production of certain documents from Matthew Meisel, a third party to this litigation, who has invoked his Fifth Amendment right against self-incrimination in refusing to admit or deny that he has those documents.[1]  NOM's argument is twofold: first, that he has inappropriately invoked the "act of production" privilege (Motion to Compel at 8-17), and second, that their production would not "pose a substantial and real hazard of self-incrimination" (Motion to Compel at 17).  The first argument rests on a far too stingy understanding of what that privilege is designed to protect; the second argument is belied by case law, common sense, and NOM's own repeated calls for Mr. Meisel's prosecution.  Because this Court must first determine whether Mr. Meisel has a

---

[1] For ease of reference, this motion will frequently refer to "the documents," which means the documents that NOM believes to be in Mr. Meisel's possession. Such a reference should not be interpreted to mean that Mr. Meisel is admitting that he has those documents or that they even exist.

reasonable fear of prosecution in this case—that is, whether he may validly invoke the Fifth Amendment at all—this Response will address that argument first and the "act of production" privilege second.

### I.   MR. MEISEL HAS A SUBSTANTIAL AND REAL FEAR OF PROSECUTION IN THIS CASE

NOM argues that "[t]he act of producing the documents sought from Mr. Meisel does not pose a 'substantial and real' hazard of self-incrimination."  Motion to Compel at 18.  The plain text of the law at issue here and NOM's own repeated calls for Mr. Meisel's prosecution make that argument, if not the definition of chutzpah, a close synonym.

### A.   NOM Has Repeatedly Called for Mr. Meisel's Prosecution Under 26 U.S.C. § 7213(a)(3), the Plain Text of Which Could Expose Him to Criminal Prosecution

The relevant statute—which, tellingly, the plaintiffs quoted in their Complaint (NOM Complaint at ¶ 37, Dkt. at 1) but not in their Motion to Compel—is 26 U.S.C. 7213(a)(3).  It reads as follows:

> It shall be unlawful for any person to whom any return or return information (as defined in section 6103(b)) is disclosed in a manner unauthorized by this title thereafter willfully to print or publish in any manner not provided by law any such return or return information.  Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution.

There is no dispute that NOM's tax returns constitute a "return or return information" under Section 6103(b).   NOM Complaint at ¶¶ 1, 3 (Dkt. at 1).  NOM itself alleges that Mr. Meisel requested that information from the IRS.  Motion to Compel at 10-11.[2]  NOM

---

[2] So does the government: "The United States contends that Matthew Meisel requested Plaintiff's 2008 Form 990 via an IRS Form 4506-A, 'Request for Public Inspection or

itself alleges that Mr. Meisel is a person "to whom" that information was "disclosed."

Motion to Compel at 4.[3]  And NOM itself alleges that Mr. Meisel distributed that

information to, at a minimum, the Human Rights Campaign (hereinafter "HRC"), which

then posted it on the HRC website.[4]  Motion to Compel at 4, 11.  According to NOM, Mr.

Meisel was at the center of the entire effort to obtain and then publish its tax returns.

Given that Section 7213(a)(3) makes it a felony to "print or publish" that information,

that Mr. Meisel has a substantial and real fear of prosecution cannot be gainsaid.  The

government might decide to prosecute him under the plain text of Section 7213(a)(3) for

"publish[ing]" the information to the HRC; under an aiding-and-abetting theory for

helping HRC and the Huffington Post publish it; or under a conspiracy theory for

attempting to obtain and publish it in the first place.  Given the overstuffed state of the

federal criminal code book, the government could doubtless come up with other laws and

other theories of prosecution, too.

     Unsurprisingly—and again, tellingly unmentioned in NOM's Motion to

Compel—NOM has repeatedly called for the prosecution of anyone involved in the

publication of its tax returns.  John Eastman, NOM's chairman, has done it:

> Eastman, in this case, is calling for more from the government: He wants
> the Department of Justice to **prosecute both the unnamed IRS leaker
> and Meisel**, the recipient of the leaked documents. **"This should be a**

---

Copy of Exempt or Political Organization IRS form,' around January, 2011." Motion to
Compel, Ex. C at 3.

[3] So does the government: "The United States contends that Plaintiff's amended 2008
Form 990, unredacted Schedule B was disclosed to Matthew Meisel."  Motion to
Compel, Ex. C at 3.

[4] So does the government: "The United States also contends that Matthew Meisel was
involved, and that individuals associated with the Human Rights Campaign ("HRC"), the
Huffington Post, and other news outlets and third parties may have been involved in the
unforeseeable dissemination of Plaintiff's amended 2008 Form 990, unredacted Schedule
B."  Motion to Compel, Ex. C at 2.

**relatively simple matter,"** he says.  Also a professor of constitutional law, Eastman is point-blank.  As if reading from the statute itself, he tells me, "Any person who inspects or discloses a tax return and knowingly is not authorized to have it is guilty of a felony, and we expect the Department of Justice to seek an indictment."

Eliana Johnson, *Investigation IDs IRS Leaker*, National Review Online, Oct. 30, 2013,

http://www.nationalreview.com/article/362667/investigation-ids-irs-leaker-eliana-

johnson (emphasis added).

Brian Brown, NOM's President, has done it at least twice:

"We have irrefutable proof that NOM's confidential tax return was released by the Internal Revenue Service and went to the number one opponent of marriage, the Human Rights Campaign (HRC) whose president was a national co-chair of President Obama's reelection campaign. The HRC promptly published it and released it to the media," said Brian Brown, NOM's president. **"This is a federal crime."**

NOM press release, October 3, 2013, http://www.nomblog.com/38136 (emphasis added).

"We are looking forward to discovery in our lawsuit to find out which IRS employee(s) were responsible for illegally releasing our confidential donor information, and **whether anyone outside the IRS played a role in the conspiracy to commit this felony**," said Brown. "The HRC can file whatever frivolous complaints they want, but we're focused like a laser beam on holding those people responsible for this crime accountable."

NOM press release, November 18, 2013, http://www.nomblog.com/38545 (emphasis added).

And Cleta Mitchell, NOM's attorney, did it earlier this month:

Who was responsible for releasing the confidential donor information of the National Organization for Marriage, the Texas Public Policy Foundation, and the Republican Governors Public Policy Council—all conservative organizations whose confidential donor schedules were released to the public by the IRS.  **That is a crime.**

February 6, 2014, Testimony by Cleta Mitchell, http://oversight.house.gov/wp-

content/uploads/2014/02/Mitchell.pdf (emphasis added).

Given that the plain text of Section 7213(a)(3) could expose Mr. Meisel to a criminal prosecution that NOM has repeatedly requested—as recently as *this month*—it cannot reasonably claim that Mr. Meisel has no legitimate fear of prosecution.

**B.    Because Mr. Meisel's Fear of Prosecution Is Objectively Reasonable, This Court Should Uphold His Invocation of the Fifth Amendment**

"The fifth amendment's protection against self-incrimination applies… not only to evidence which may directly support a criminal conviction, but to 'information which would furnish a link in the chain of evidence that could lead to prosecution, as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution.'"  *United States v. Sharp*, 920 F.2d 1167, 1170 (4th Cir. 1990) (quoting *Maness v. Meyers*, 419 U.S. 449, 461 (1975)).  In the Fourth Circuit, "the proper test [for a valid invocation of the Fifth Amendment] simply assesses the objective reasonableness of the target's claimed apprehension of prosecution." *Sharp*, 920 F.2d at 1171 (reversing the district court's order holding the defendant in contempt for refusing, on Fifth Amendment grounds, to answer questions and produce documents in a civil tax proceeding); *see also United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 415 F. Supp. 2d 628, 633 (E.D. Va. 2006) ("A valid assertion of the privilege requires only the existence of a *plausible possibility* that the person might be prosecuted in this country.") (emphasis added) (upholding a civil defendant's assertion of the privilege, given his reasonable fear that he could be prosecuted for a conspiracy to commit fraud based on contact that occurred in Iraq).  If Mr. Meisel's assertion of the Fifth Amendment in this case is not valid, then no one's is.

Moreover, "the reasonableness of a claimed apprehension *should simply be assumed* once incriminating potential is found, unless there are genuine questions about the government's legal ability to prosecute." *Sharp*, 920 F.2d at 1171 (emphasis added). A court evaluating an assertion of the privilege "should not engage in raw speculation as to whether the government will actually prosecute, and should only pursue that inquiry when there are real questions concerning the government's ability to do so because of legal constraints such as statutes of limitation, double jeopardy, or immunity." *Id.* (footnotes and citations omitted). There are no such questions here, nor does NOM allege otherwise. Indeed, Mr. Meisel has requested statutory immunity from the government pursuant to 18 U.S.C. §§ 6002 and 6003, but the government has, as of this filing, indicated no willingness to grant it.

NOM argues that neither the act of producing the documents nor divulging his putative communications with the "promising conduit" would "incriminate him or provide a link in the chain leading to potential prosecution." Motion to Compel at 19.[5] But of course it would; Mr. Meisel will take each of NOM's requested documents in turn.

NOM's first request is that Mr. Meisel produce copies of NOM's 2007 and 2008 IRS Form 990s that were allegedly sent to him. NOM suggests that these documents would not constitute a "link in the chain" of any prosecution of him. But to prosecute Mr. Meisel for violating Section 7213(a)(3) by publishing the returns, the government would have to prove that he actually *obtained* them; he cannot have published something he never possessed. The very act of producing them—admitting he had them and

---

[5] Although NOM may be "unable to identify any law which would punish the mere possession of communications with an employee of the federal government," (Motion to Compel at 19), Mr. Meisel can. *See, e.g.*, 18 U.S.C. § 371 (the general federal conspiracy statute).

6

authenticating that these are, indeed, the documents NOM is looking for—would thus constitute not just a link in the chain, but half the chain itself.

NOM's second request is that Mr. Meisel produce copies of the IRS Form 4506-A that he allegedly submitted to the IRS when seeking NOM's tax returns.  This document, too, would be an enormous link in the chain.  There are at least two reasons for this.  One, proving that Mr. Meisel *requested* the documents would bolster an eventual prosecution's case that he eventually *possessed* them.  Two, it would be powerful evidence in a conspiracy prosecution, even if the government were never able to prove that he actually received the documents from the IRS.  Simply *trying* to obtain them could easily constitute an overt act in a prosecution for conspiracy to violate Section 7213(a)(3).

NOM's third request is that Mr. Meisel produce copies of the IRS 3983C letter that was allegedly sent to him with the tax returns—in other words, the cover letter for the most potentially incriminating documents in the case.  For the reasons already stated above, it is only barely less incriminating for Mr. Meisel to produce the cover letter than it is for him to produce the tax returns themselves.

NOM's fourth request is its broadest, and the most akin to a fishing expedition: documents constituting communications allegedly between Mr. Meisel and the person referred to as a "promising conduit" in a Gchat log.  NOM's insistence that the production of such documents would not incriminate him is no less convincing for this request than it is for the previous three.  First, documents suggesting that Mr. Meisel worked with a "promising conduit" instead of going through standard IRS channels could be powerful evidence that any subsequent involvement by him in the publication of NOM's tax returns was "willful[]" under Section 7213(a)(3).  Second, if the government

decided to prosecute Mr. Meisel for conspiring with the "promising conduit" regarding the publication of NOM's tax returns (or aiding and abetting that publication), any communications with the "promising conduit" would be direct evidence of conspiracy. Third, Mr. Meisel, by his act of producing any such "promising conduit" communications, would necessarily be affirming that such communications happened and authenticating whatever documents contained them.  As will be discussed in more detail in the next section, this is precisely what the act of production privilege is meant to prohibit.

NOM asks this Court to force Mr. Meisel to admit that he possesses, and then to produce, documents that would constitute the very heart of a later criminal prosecution of him—a prosecution that NOM itself has repeatedly, and publicly, called for.  This Court should accord NOM's argument that Mr. Meisel has nothing to worry about roughly the same respect that Dorothy accorded Oz when he told her to pay no attention to that man behind the curtain.

## II.   MR. MEISEL'S INVOCATION OF THE ACT OF PRODUCTION PRIVILEGE FALLS SQUARELY WITHIN SUPREME COURT AND FOURTH CIRCUIT PRECEDENT

The act of production privilege protects a witness from "producing documents in response to a subpoena" when such production "may have a compelled testimonial aspect," as the "'act of production' itself may implicitly communicate 'statements of fact.'"  *United States v. Hubbell*, 530 U.S. 27, 36 (2000).  That is, when the *production itself*—separate and apart from the *contents* of the documents—may incriminate a witness, he may properly invoke the act of production privilege and decline to produce them.  NOM does not dispute the existence of the privilege or even its application,

generally speaking, in a case like this.  Rather, its argument rests entirely on the

contention that because it is a "foregone conclusion" that Mr. Meisel has the documents it

wants, the privilege does not apply.  In other words, NOM is tacitly conceding—to its

credit—that if it loses the "foregone conclusion" argument, it loses the act of production

argument.  Mr. Meisel will address that analysis with respect to each of the documents in

turn.

> A.  **The Government's Discovery Responses, One Online News Article, and a Few HRC Emails Do Not Render Mr. Meisel's Possession of the Requested Documents a "Foregone Conclusion"**

"The government cannot make an end-run around the Fifth Amendment by

fishing for a document that will answer a question for which it could not demand an

answer in oral examination." *United States v. Ponds*, 454 F.3d 313, 327 (D.C. Cir. 2006).

The mere act of producing certain documents may result in incriminating evidence in two

situations: (1) if the existence and location of the subpoenaed papers are *unknown to the

requester*; and (2) where production would *implicitly authenticate* the documents. *See

Hubbell*, 530 U.S. at 44-45; *Fisher v. United States*, 425 U.S. 391, 411 (1976).  NOM's

argument that it's a "foregone conclusion" that Mr. Meisel has the documents it seeks is

based entirely on three things: the government's discovery responses; an October 30,

2013 article published in the National Review Online; and emails that it received from

HRC.  None of those documents, together or separately, makes Mr. Meisel's possession

(*vel non*) a "foregone conclusion" that suffices to vitiate his Fifth Amendment right.

Because the documents NOM seeks can be divided into two different categories—the tax

documents and the "promising conduit" communications—Mr. Meisel will address the

two categories in turn.

### 1. The IRS Form 4506-A, the Unredacted Tax Returns, and the 3983C Letter

For the government to later prove, in a criminal prosecution, that Mr. Meisel unlawfully published, or aided and abetted in the publishing of, NOM's tax returns, it must prove at least six facts:

1) Mr. Meisel requested NOM's tax returns using form 4506-A (hereinafter, "the request form");

2) The IRS printed NOM's unredacted tax returns and the 3983-C letter (hereinafter, "the cover letter");

3) The IRS sent the tax returns and the cover letter to Mr. Meisel;

4) Mr. Meisel received the tax returns and the cover letter;

5) Mr. Meisel sent the tax returns to the Human Rights Campaign (HRC) and/or the Huffington Post; and

6) The HRC and/or the Huffington Post published them.

NOM's motion to compel—if it were granted and if Mr. Meisel were found to have all of the documents NOM requests—would establish every link in that chain.  In other words, producing those documents (if they exist) would be the functional equivalent of handing them to the Grand Jury and helping draft the indictment.  NOM says, essentially, that it's too late for Mr. Meisel to worry about that—that because it is a "foregone conclusion" that he has the documents, the act of production privilege does not apply and he must hand over what he has.  But NOM's support for that assertion rests more on assumptions than evidence—and piercing the Fifth Amendment privilege against self-incrimination based only on assumptions is exactly what the act of production privilege is meant to prohibit.

### a.  The 4506-A Request Form

The first link in the chain requested by NOM is the 4506-A request form.  NOM itself admits that it does not have a copy of the request form, and the government also admits that it doesn't, either.  *See* Motion to Compel at 6 (stating that "the Government has been unable to produce a copy of the IRS Form 4506-A it claims Mr. Meisel submitted to the IRS").  NOM *assumes* that he has it, based on the government's discovery response "contend[ing]" that he used one, but the government provided no actual evidence for that contention.  Instead, NOM just assumed so because that is how IRS procedure works.  But assumptions are not evidence, and the mere assumption that someone has a document hardly makes it a "foregone conclusion" that he does.[6]  The only way for NOM (or the government) to prove that Mr. Meisel submitted the request form—as opposed to obtaining it through less official means—is to ask him for a copy of it.  That is the kind of fishing expedition that the act of production privilege prohibits. *See Hubbell*, 530 U.S. at 45 ("The Government cannot cure [its inability to confirm the existence and authenticity of requested documents] through the overbroad argument that a businessman such as respondent will always possess general business and tax records that fall within the broad categories described in this subpoena.").  Just as the *Ponds* court could not assume that the defendant's possession of a Mercedes meant that he necessarily had the ownership documents to go with it, neither should this Court assume that just because the IRS typically follows certain procedures, it followed them in this case.  454

---

[6] Given the government's contention that disclosure of the unredacted tax returns was nothing more than bureaucratic error, *see* Motion to Compel, Ex. C at 9, it would be especially ironic for this Court to vitiate Mr. Meisel's privilege claim based on an assumption about how IRS procedures usually work.

F.3d at 325 (noting that "the government cannot show knowledge by means of broad assumptions about car ownership, much less mere possession").

### b.   The Unredacted Tax Returns

The second, third, and fourth links in the chain all go together—namely, that the IRS printed the unredacted tax returns and sent them, along with a cover letter, to Mr. Meisel.  And again, NOM admits that it doesn't have copies of what the IRS allegedly sent Mr. Meisel, and the government admits that it doesn't, either.  *See* Motion to Compel at 6 ("Nor has the Government produced copies of the tax returns accessed and printed by the named IRS agent, or copies of the tax returns mailed to Mr. Meisel by the IRS.  The Government claims all of these documents have been destroyed in accordance with IRS procedure.").  *Indeed, NOM cannot even prove whether the IRS sent Mr. Meisel NOM's original or amended 2008 tax return.  See* Motion to Compel at 5 ("Even though the named IRS agent accessed and printed NOM's original 2008 Form 990, including the Schedule B, *the Government alleges* that the IRS did not produce that document to Mr. Meisel.") (Motion to Compel, Ex. C at ¶8(t)) (emphasis added).  To this day, the IRS has not "produced copies of the tax returns accessed and printed by the named IRS agent, or copies of the tax returns mailed to Mr. Meisel by the IRS."  Motion to Compel at 6. When the requesting party does not know whether the requested documents exist, it may not "compensate for its lack of knowledge by requiring the [responding party] to become, in effect, the primary informant against himself."  *In re Grand Jury Empanelled March 19, 1980,* 680 F.2d 327, 335 (3d Cir. 1982), *aff'd in part & rev'd in part sub. nom. United States v. Doe,* 465 U.S. 605, 617 (1984).

The only way for NOM (or the government) to prove which tax returns Mr. Meisel received, or if he received them at all, is to ask him to produce them. The act of production privilege prohibits that. NOM's claim that it is a "foregone conclusion" that Mr. Meisel has the unredacted tax returns has superficial appeal but fails upon close inspection.

The first basis for NOM's assertion that it's a "foregone conclusion" that Mr. Meisel *received* the returns (as opposed to their having been *produced* by the IRS) is a news article saying so. *See* Motion to Compel at 10 (citing Eliana Johnson, *Investigation IDs IRS Leaker*, National Review Online, Oct. 30, 2013, http://www.nationalreview.com/article/362667/investigation-ids-irs-leaker-eliana-johnson). The news article cites an unnamed source on the House Ways and Means Committee (describing the source collectively as "Camp's panel," referring to committee chairman Dave Camp). NOM gamely tries to vest the anonymously sourced news article with the same authority as the Ways and Means Committee itself, but an anonymous leak to a reporter is not the same thing as a Committee report. And surely an anonymously sourced news article is not enough to render a hotly contested question enough of a "foregone conclusion" to overcome a witness's Fifth Amendment rights.

The second basis for NOM's assertion that it's a "foregone conclusion" that Mr. Meisel received the returns is simply an inference—that because Mr. Meisel allegedly requested them, and because the IRS printed them to be sent out (Motion to Compel, Ex. C at 9), Mr. Meisel must have received them. Motion to Compel at 10. As discussed above, NOM does not have any documentation showing that Mr. Meisel requested the returns, and its mere assumption that because they were printed out, he must have

received them in due course, is hardly the kind of evidence that renders his possession a "foregone conclusion."

The third and final basis for NOM's assertion that it's a "foregone conclusion" that Mr. Meisel received the returns is also an inference—this one, made from emails produced by HRC. In its Motion to Compel, NOM characterized those emails as "revealing that Mr. Meisel furnished to HRC a copy of NOM's unredacted 2008 Schedule B." Motion to Compel at 11. Tellingly, NOM did not quote the emails that it attached, because that is not what they say. The emails show mmeisel@gmail.com emailing with Kevin.Nix@hrc.org and stating, in relevant part, the following: "I have a small amount of information relating to NOM's finances that might be of interest to you." Motion to Compel, Ex. C at 2. NOM infers, and asks this Court to infer, that the "small amount of information" is NOM's unredacted tax returns. But the emails attached by NOM do not say that. (Even if they did, it would still not be a foregone conclusion that what Mr. Meisel allegedly sent HRC is exactly what the IRS allegedly sent Mr. Meisel.) NOM simply asks this Court to make yet another assumption on which to rely in denying Mr. Meisel's privilege claim.

The only way to fill all of these gaps, and resolve all of these ambiguities, is to ask Mr. Meisel. He's not talking. And NOM "cannot make an end-run around the Fifth Amendment by fishing for a document that will answer a question for which it could not demand an answer in oral examination." *Ponds*, 454 F.3d at 327.

### c. The 3983C Cover Letter

Analytically speaking, the cover letter is on the same footing as the request letter—NOM does not have it, the government does not have it, and no one ever

published it.  NOM assumes that it exists, and that Mr. Meisel has it, simply because the

cover letter is "'a typical letter used in responding to Form 4506-A requests.'"  Motion to

Compel at 14 (quoting Motion to Compel, Ex. C at 9¶u).  But that argument assumes that

Mr. Meisel received the letter and also that he received it (and the tax returns themselves)

through standard IRS channels.  If he has the letter and is forced to produce it, he would

be giving the government the fourth link in the chain, as noted above.  If he does not have

the letter and is forced to acknowledge as much, the government may assume that he

obtained the unredacted returns through an unofficial, illicit channel—or, as NOM would

have it, the "promising conduit"—which could help the government prove that he was

involved in a conspiracy or that his putative role in the publication of the documents was

willful.  Either way, he is damned if he does and damned if he doesn't—precisely the

kind of cruel dilemma that the act of production privilege is mean to protect.

## 2.  The Purported "Promising Conduit" Communications

In addition to the tax documents, NOM also seeks to compel Mr. Meisel to

produce communications between the "promising conduit" mentioned in a Gchat

exchange that allegedly occurred between Mr. Meisel and one Ian Grady.  Other than Mr.

Meisel's use of the "promising conduit" phrase one time in one Gchat exchange, NOM

has absolutely no idea what, if any, "promising conduit" communications exist or if a

"promising conduit" even existed at all.  NOM's request for the communications is thus a

classic fishing expedition barred by *Hubbell*; *see also In re Grand Jury Subpoena Duces

Tecum Dated March 25, 2011*, 670 F.3d 1335, 1347 (11th Cir. 2012) (holding that the

foregone-conclusion rationale does not apply where the entity requesting the documents

"had no knowledge of the existence of documents, other than a suspicion that documents

likely existed and, if they did exist, that they would fall within the broad categories requested" and that "categorical requests for documents the government anticipates are likely to exist will not suffice.").

Moreover, forcing Mr. Meisel to produce these communications (if they exist) would plainly incriminate him. NOM's request would require Mr. Meisel to use the "contents of his mind to incriminate himself or lead the Government to evidence that would incriminate him." *In re Grand Jury Subpoena Duces Tecum dated March 25, 2011*, 670 F.3d at 1349. For Mr. Meisel to produce documents responsive to NOM's request, he would necessarily have to tell NOM—and thus the government—who the "promising conduit" is and the nature of Mr. Meisel's relationship with it. Such a response is classically "testimonial." Indeed, if such "promising conduit" communications exist, they could help prove that Mr. Meisel conspired with the conduit to obtain and publish the documents or that he acted willfully in so doing. His production of them would also necessarily authenticate them and thus free the government, in any subsequent prosecution, from having to subpoena the emails, phone records, or other documents that it would otherwise need to establish that link in the chain.

NOM has no idea who the "promising conduit" is, if that person or entity even exists, or what communications might have taken place between the "promising conduit" and Mr. Meisel. It is just fishing. Forcing Mr. Meisel to bite would require him, in every real sense of the word, to give *testimony* about whether such a conduit existed, who it was, and what they talked about. This is exactly what the act of production privilege seeks to protect.

### 3. Conclusion

Given how little NOM knows about the documents it is seeking from Mr. Meisel, and the number of assumptions on which its motion to compel is based, it cannot be said that Mr. Meisel's production of documents would "add little or nothing to the sum total of [NOM's] information." *United States v. Stone*, 976 F.2d 909, 911 (4th Cir. 1992) (holding that documents "are unprotected by the privilege against self-incrimination because their existence, possession, and authentication are a 'foregone conclusion'; their production 'adds little or nothing to the sum total of the Government's information.'") (quoting *Fisher*, 425 U.S. at 411). To the contrary, if Mr. Meisel were forced to admit that he possessed the tax documents and "promising conduit" communications in response to NOM's subpoena request, he would be authenticating all six major links in the chain of evidence against him.

### B.       The Authentication of the Requested Documents Is Not a "Foregone Conclusion"

The authenticity prong of the foregone conclusion doctrine requires NOM to establish that it can independently verify the authenticity of the documents requested. *Stone*, 976 F.2d at 911 (stating that "the authentication is a foregone conclusion if someone else can verify that the records are in fact what they purport to be."). Contrary to what NOM alleges, it cannot authenticate the documents without Mr. Meisel's help. The only way for it to authenticate the request form and the cover letter—documents that neither NOM nor the government have—is for Mr. Meisel to produce them and, by producing them, authenticate them. The same is true of the unredacted tax returns that were allegedly mailed to Mr. Meisel by the IRS—although the government presumably has file copies of NOM's tax returns, it did not keep copies of what it allegedly sent Mr.

17

Meisel.  *See* Motion to Compel at 2 ("As a result of the lack of availability of [the tax returns] from the Government, NOM (and the Government) sought the requested information from [Mr. Meisel]."  NOM is implicitly admitting that it has no other way to authenticate any documents sent by the IRS to Mr. Meisel except by asking Mr. Meisel to produce them.  That, it cannot do.

### III.     *IN CAMERA* REVIEW IS NECESSARY ONLY FOR THE PURPORTED "PROMISING CONDUIT" DOCUMENTS

NOM asserts that an *in camera* review is necessary for all of the requested documents because "[i]t is this Court, and not Mr. Meisel, who decides whether the privilege has been properly asserted."  Motion to Compel at 19.  To be sure, Mr. Meisel does not dispute that this Court must decide whether his invocation of the act of production privilege is valid.  But if it determines that Mr. Meisel has a reasonable fear of prosecution and finds that the act of producing the requested IRS documents could incriminate him, it does not need to perform an *in camera* review regarding any IRS documents that Mr. Meisel may or may not have.  NOM has, to its credit, has sufficiently narrowed its request for IRS documents that the Court can decide that question on the papers.  It does not, for example, need to comb through diary entries or go question-by-question through a deposition transcript.

The same is not true of any "promising conduit" documents, however.  The Court cannot determine whether Mr. Meisel is validly asserting the act of production privilege with respect to those documents without first knowing what is, or is not, there.  Accordingly, Mr. Meisel agrees that the Court should conduct an *in camera* review of any such documents to determine if they exist and, if so, whether they are protected by the act of production privilege.

## IV.    CONCLUSION

Mr. Meisel understands why NOM wants to know if he has the documents it believes he has.  But NOM is no more entitled to compel them from him than the government would be if it decided to prosecute him criminally.  The Fifth Amendment privilege is the same, no matter who is asking.  If the government could not, without granting Mr. Meisel statutory immunity, subpoena the documents from him in a criminal investigation, then neither can NOM compel them from him in a civil case.  Indeed, that this is a civil and not a criminal case is an important distinction, as is the fact that Mr. Meisel is a third party, not an actual party, to this litigation. "'Whatever justification there may be for requiring a witness to give incriminating testimony in aid of a criminal investigation after the government has granted use immunity, there is no similar justification for compelling a witness to give incriminating testimony for the benefit of a private litigant when the government has *not* chosen to grant immunity.'"  *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262 (1983) (quoting *id.* at 267 (Marshall, J., concurring).  Mr. Meisel has not been granted immunity.  He respectfully asks this Court not to expose him, a non-party to this litigation, to the very real possibility of criminal prosecution simply to satisfy the plaintiffs' civil discovery request.


Respectfully submitted this 26th day of February, 2014.

_____/s/_____
Allison Lansell (Va. 84087 )
Justin Dillon (D.C. 502322)
(application for admission *pro hac vice* pending)
The Kaiser Law Firm PLLC
1400 Eye St. NW, Suite 525
Washington, DC 20005
(202) 640-2850 (telephone)

(202) 280-1034 (fax)
alansell@tklf.com
jdillon@tklf.com
Counsel for Third-Party Witness Matthew Meisel