IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

THE NATIONAL ORGANIZATION     )
FOR MARRIAGE, INC.,           )
                              )
     Plaintiff,               )
                              )
          v.                  )     1:13cv1225 (JCC/IDD)
                              )
THE UNITED STATES OF AMERICA, )
INTERNAL REVENUE SERVICE,     )
                              )
     Defendant.               )

**M E M O R A N D U M   O P I N I O N**

Plaintiff The National Organization for Marriage, Inc.
("NOM") has filed this action alleging that the United States of
America, through agents of the Internal Revenue Service ("IRS"),
violated 26 U.S.C. § 6103 by improperly disclosing its
confidential tax return information.  (Compl. [Dkt. 1] at 1-2.)
Currently before the Court is the Government's Motion for
Summary Judgment.  (Summ. J. Mot. [Dkt. 67] at 1.)  For the
reasons set forth below, the Court will grant in part and deny
in part the Government's motion.

### I. Background[1]

NOM is a social welfare association purportedly
organized "to protect marriage and the faith communities that

---

[1] The following facts are taken from the parties' Local Rule 56(B) statements,
summary judgment briefs, and other evidence submitted by the parties.  They
are undisputed unless otherwise indicated.

sustain it across the United States." (Pl.'s Opp'n [Dkt. 73] at 1.) As a tax-exempt organization, NOM must file a Form 990 annually with the IRS. *See* 26 U.S.C. § 6033. Schedule B to Form 990 ("Schedule B") lists donors who have contributed $5,000 or more during the reporting period.

In January 2011, Matthew Meisel ("Meisel") submitted an application to the IRS for copies of NOM's publicly available tax returns. (Pl.'s Opp'n at 4-5.) Outside of the fact that Meisel identified himself as a member of the media, the specifics of his request are unknown because, pursuant to IRS policy, his request was destroyed after forty-five days. (*Id.* at 4.) Meisel's application was forwarded to Wendy Peters ("Peters"), a clerk in the IRS's Return and Income Verification Services unit ("RAVIS unit"). (Gov't's Mem. [Dkt. 68] at 5; Pl.'s Opp'n at 4-5.)[2]

On January 19, 2011, Peters emailed Peggy Riley ("Riley"), an IRS media relations specialist, to verify Meisel's status as a member of the media because it was then IRS policy to expedite media requests. (Gov't Ex. 3.) Riley responded that she would look into the matter. (*Id.*)

On January 21, 2011, Peters printed copies of NOM's 2007 Form 990 and the original and amended Form 990 for 2008.

---

[2]  Meisel was subpoenaed in this matter but chose to invoke the Fifth Amendment in response to counsels' questioning. (Gov't's Mem. at 27 n.11.) Accordingly, his version of events is presently unknown.

(Gov't Ex. 8.)  When Peters accessed and viewed these documents, a unique tracking number was created in an IRS database called the Statistics of Income Exempt Organizations Return Image Network ("SEIN").  (Gov't's Mem. at 5-6.)  This tracking number was also imprinted as a watermark on each page of the printed copies.  (*Id.*)  Peters claims that she did not alter this watermark.  (*Id.* at 6.)

On January 24, 2011, Peters again emailed Riley regarding Meisel's claimed status as a member of the media. (Gov't Ex. 3.)  It is unclear whether Riley ever responded.

On January 31, 2011, Peters accessed the IRS's Integrated Data Retrieval System ("IDRS") and created an "IRS 3983C letter."  (Gov't's Mem. at 6-7; Pl.'s Opp'n at 6.)  An IRS 3983C letter is the standard reply to public requests for information.  (*Id.*)  The Government contends that this letter was produced in response to Meisel's application.  (Gov't Mem. at 7.)  NOM, however, disagrees with this position because IDRS records do not identify the recipient of a 3983C letter or the documents attached thereto.  (Pl.'s Opp'n at 6.)  Nevertheless, it is undisputed that an unredacted copy of NOM's amended 2008 Form 990 bearing the above mentioned watermark was thereafter sent to Meisel along with such a letter.  (Gov't's Mem. at 6-7; Pl.'s Opp'n at 6.)

The parties agree that, in response to public requests for tax information, IRS procedures require the omission of donor information listed in Form 990. (Gov't's Mem. at 7; Pl.'s Opp'n at 7.)  Here, the Government contends that Peters forgot to redact the names and addresses of NOM's donors before sending the amended 2008 Form 990 to Meisel. (Gov't's Mem. at 7.)  NOM disputes this assertion, claiming the record is unclear regarding "who was responsible for sending [Meisel] an redacted copy of NOM's Schedule B, and why any transmittal from the IRS to [Meisel] occurred." (Pl.'s Opp'n at 7.)

On March 28, 2012, Meisel sent Kevin Nix ("Nix"), a Campaign Media Director for the Human Rights Campaign ("HRC"), a copy of NOM's amended 2008 Form 990, Schedule B. (Gov't's Mem. at 7.)  The copy sent to Nix contained a redaction of the numerical watermark discussed above. (Pl.'s Opp'n at 7.)  The HRC then forwarded the Schedule B to a journalist at the Huffington Post, who published it along with an article focusing on the fact that an Alabama state political action committee associated with Mitt Romney made a $10,000 donation to NOM in 2008. (Gov't's Mem. at 8.)

The Treasury Inspector General for Tax Administration was able to digitally un-redact the watermark, revealing that the number 100560209 was imprinted on each page of the Schedule B published by the Huffington Post. (Gov't's Mem. at 8; Pl.'s

4

Opp'n at 7.) Querying this number in the SEIN database allowed IRS administrators to identify Peters as the individual who accessed and printed the document at issue. (*Id.*) At the time of the disclosure, Peters was unaware of NOM's mission or those of its political opponent, the HRC. (Gov't's Mem. at 9; Pl.'s Opp'n at 7.) Peters had also never heard of Meisel. (*Id.*)

On May 15, 2012, Fred Karger ("Karger"), a self-proclaimed opponent of NOM, filed a complaint with the State of California's Fair Political Practices Commission ("FPPC"), alleging that NOM violated various state election laws during 2008. (Gov't's Mem. at 10-11.) Karger's claims were based, at least in part, on information garnered from NOM's Schedule B. (Pl.'s Opp'n at 8.) Indeed, his original complaint contained screen shots of NOM's Schedule B, as published by the HRC. (*Id.*) NOM hired legal counsel to protect the confidential donor information disclosed by Karger, and ultimately NOM was absolved of any wrongdoing. (*Id.* at 8-10.)

On October 3, 2013, NOM instituted the instant action, "seeking damages pursuant to 26 U.S.C. § 7431 for unlawful inspection and disclosure of confidential tax information . . . in violation of 26 U.S.C. § 6103." (Compl. at 1.) According to NOM, the disclosure discussed above was "part of a deliberate attempt to chill the First Amendment activity of NOM, its donors, and others who associate with NOM." (*Id.*) NOM

5

is seeking actual damages in the form of lost contributions and legal fees incurred in investigating the disclosure and preventing further dissemination of its donor information. (Compl. at 22-23.)  NOM is also claiming punitive damages because, according to its reading of the above facts, the IRS's disclosure was done "willfully or as a result of gross negligence."  (*Id.* at 21.)

Presently before the Court is the Government's Motion for Summary Judgment.  Although the Government admits that an IRS staff member improperly disclosed an unredacted copy of NOM's Schedule B in violation of § 7431, the following issues are now in dispute: (1) whether NOM is entitled to punitive damages; (2) whether the examination of NOM's confidential tax information by Peters and others were "authorized" inspections under the statute; (3) whether NOM's legal expenses for investigating the disclosure are recoverable damages; and (4) whether NOM's claimed damages are subject to an offset against donations received because of the publicity surrounding this case.  (Gov't Mem. at 1-4.)

Having been fully briefed, the Government's motion is now before the Court.

## II. Standard of Review

It is well settled that a motion for summary judgment should be granted only "if the pleadings, depositions, answers

6

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). The burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).

Where, as in this case, the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the non-movant's claim. *See Celotex,* 477 U.S. at 323–25. In response to such a showing, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist that must be resolved at trial. *See id.* at 324; *Anderson,* 477 U.S. at 248.

In reviewing the record on summary judgment, the Court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted). "[A]t the summary

judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

The nonmoving party, however, must show more than some metaphysical doubt as to the material facts. "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Anderson,* 477 U.S. at 256). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. *See Anderson,* 477 U.S. at 249-50. There must be evidence on which the jury could reasonably find for the non-moving party. *Id.* at 252. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the opposing party is entitled to a verdict.

### III. Analysis

#### A. Statutory Framework

As noted above, NOM alleges that the inspection and disclosure of its tax return information violated 26 U.S.C. §§ 6103 and 7431. These provisions generally provide that it is unlawful for a federal official to inspect and/or disclose a

taxpayer's tax return absent authorization. *See Lampert v. United States,* 854 F.2d 335, 336 (9th Cir. 1988) ("26 U.S.C. § 6103(a), of the Internal Revenue Code lays down a general rule that returns and return information . . . shall be confidential." (citation and internal quotation marks omitted)).

The text of 26 U.S.C. § 7431 establishes a civil cause of action "[i]f any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103[.]" 26 U.S.C. § 7431(a). Once liability is proven, this provision permits the following damages:

> [D]efendant shall be liable to the plaintiff in an amount equal to the sum of—
>
> (1) the greater of—
>
>> (A) $1,000 for each act of unauthorized inspection or disclosure of a return or return information with respect to which such defendant is found liable, or
>>
>> (B) the sum of—
>>
>>> (i) the actual damages sustained by the plaintiff as a result of such unauthorized inspection or disclosure, plus
>>>
>>> (ii) in the case of a willful inspection or disclosure or an inspection or disclosure which is the result of gross negligence, punitive damages, plus

> (2) the costs of the action, plus
>
> (3) in the case of a plaintiff which is described in section 7430(c)(4)(A)(ii), reasonable attorneys fees, except that if the defendant is the United States, reasonable attorneys fees may be awarded only if the plaintiff is the prevailing party[.]

26 U.S.C. § 7431(c).  In short, for each negligent disclosure or inspection, a plaintiff may recover statutory damages of $1,000 or, alternatively, actual damages.  And, if the inspection or disclosure is willful or grossly negligent, a plaintiff may be entitled to punitive damages.  *See Mallas v. United States,* 993 F.2d 1111, 1125-26 (4th Cir. 1993).

With the above standards in mind, the Court will turn to the issues raised in the Government's motion.

## B. Punitive Damages

The Government first argues that NOM, "as a matter of law, cannot demonstrate that the disclosure of its 2008 Schedule B was the result of gross negligence" or "willfulness" as required to recover punitive damages under § 7431(c).  (Gov't's Mem. at 17-19.)  Having reviewed the record, the Court agrees.

As detailed above, § 7431(c) authorizes punitive damages only if the disclosure was willful or grossly negligent. "Willful conduct is that which was done without ground for believing that it was lawful or conduct marked by a careless disregard of whether one has a right to act in such manner . . .

10

. Conduct that is grossly negligent is that which is either willful or marked by wanton or reckless disregard of the rights of another." *Barrett v. United States,* 100 F.3d 35, 40 (5th Cir. 1996) (citations and internal quotation marks omitted); *see also Scrimgeour v. Internal Revenue,* 149 F.3d 318, 324-25 (4th Cir. 1998) (to recover punitive damages based on the improper release of confidential tax return information, the taxpayer has the burden of demonstrating that the disclosure was willful or grossly negligent). Accordingly, in order to survive summary judgment, NOM, as the party with the burden of proof as to this issue, was required to produce sufficient evidence from which the fact finder could conclude that the disclosure was willful or grossly negligent. *See Celotex,* 477 U.S. at 323-25. NOM has not carried this burden.

NOM has proffered no evidence that its unredacted tax information was willfully disclosed. The record provides a specific timeline evidencing that NOM's Schedule B was released inadvertently as part of a single employee's mistake. (Gov't's Mem. at 8-9.) NOM's attempt to discredit this theory by pointing out that IRS records are incomplete regarding precisely what happened in this case is insufficient to create a material issue of fact as to the source of the disclosure. *See Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise

11

properly supported motion for summary judgment."). The email
evidence, deposition testimony, watermark, and entries from SEIN
and IDRS compel the conclusion that Peters accidentally
forwarded an unredacted copy of NOM's 2008 Schedule B in
response to Meisel's request. (*See* Gov't's Mem. at 7-9.) NOM
has produced no evidence from which a reasonable juror could
conclude otherwise, and therefore its unsubstantiated assertion
that another source could have intentionally released the
Schedule B falls flat. *See Anderson,* 477 U.S. at 249-50 ("If
the evidence is merely colorable, or is not significantly
probative, summary judgment may be granted."); *City of Richmond
v. Atl. Co.,* 273 F.2d 902, 910 (4th Cir. 1960) ("The general
rule requires that the evidence must generate an actual rational
belief in the existence of a disputed fact, and that evidence
which leaves the issue to surmise or conjecture, leaving the
minds of the jurors in equipoise, is never sufficient[.]").

NOM's argument that the disclosure was intentional
because the Schedule B was given to a "known political activist"
and "altered to obscure its internal IRS markings" is similarly
unfounded. (Gov't Ex. 1.) The evidence is unrefuted that
Peters did not know Meisel or have any connection to the HRC
when she disclosed the information. Furthermore, NOM has failed
to produce a shred of proof that anyone at the IRS altered or
obscured the watermark. In short, NOM's allegations of

12

willfulness are unsupported by any evidence and thus
insufficient. *See Celotex,* 477 U.S. at 323 ("[A]fter adequate
time for discovery and upon motion, [summary judgment is
appropriate] against a party who fails to make a showing
sufficient to establish the existence of an element essential to
that party's [claim], and on which that party will bear the
burden of proof at trial."); *Messing v. CSX Transp., Inc.,* No.
98-1516, 1999 WL 14122, at *2-3 (4th Cir. Jan. 15, 1999)
(affirming dismissal on summary judgment where plaintiff failed
to produce any evidence supporting his claims).

The record is equally deficient concerning NOM's
assertion of gross negligence. "Under § 7431(c)(1)(B)(ii),
grossly negligent conduct is 'that which is . . . marked by
wanton or reckless disregard of the rights of another.' In
contrast, simple negligence is the lack of due care."
*Scrimgeour,* 149 F.3d at 323-24 (citations omitted). The
evidence in this case plainly falls in the latter category. As
discussed above, the only logical conclusion from the record is
that Peters failed to prepare the documents correctly and
carelessly sent Meisel an unredacted copy of NOM's 2008 Schedule
B. These actions do not, as a matter of law, reflect any
greater level of culpability than simple negligence. *See Mallas
v. United States,* No. 94-2138, 1995 WL 290401, at *3 (4th Cir.
May 15, 1995) (stating that to establish gross negligence, the

disclosure must represent a "flagrant violation of 26 U.S.C. § 6103").

The instant case is similar to *Miller v. United States,* 66 F.3d 220 (9th Cir. 1995), in which the Ninth Circuit affirmed the district court's conclusion that an unauthorized disclosure by an IRS agent to a newspaper reporter, who subsequently published the information, "was negligent, but not willful or grossly negligent." *Id.* at 224.  Specifically, the court held:

> The district court correctly viewed the disclosure as a momentary and insignificant oversight.  To quote the court, "Well, I think this is an oops case. O-O-P-S, oops." The only evidence to counter this finding is the fact that [the agent] knew that Levin was a reporter and that [the agent] had been trained not to disclose taxpayer information.  Even though [the agent's] unauthorized disclosure of taxpayer return information to a reporter is more serious in the abstract than an unauthorized disclosure to a private citizen, we conclude the district court did not clearly err in finding that [the agent's] disclosure was the result of simple negligence.  In the main, the record suggests that [plaintiff] and her attorneys have attempted to convert a proverbial molehill into Ft. Knox.

*Id.*  Although factually distinguishable, *Miller* highlights the principle that an inadvertent disclosure, such as that presented here, does not rise to the level of gross negligence.

Apparently recognizing that Peters' conduct falls far short of gross negligence, NOM dedicates a significant portion

14

of its brief to attacking the IRS's internal procedures for processing such requests. (Pl.'s Opp'n at 14 ("[T]he record evidence demonstrates a systematic failure by the Government marked by 'reckless disregard' of its statutorily mandated duty to protect the confidential donor information of exempt organizations.").) Specifically, NOM states:

> While the actual disclosure may have been inadvertent, it was brought about by, among other things: (1) overbroad access to non-public return information (Statement of Material Facts that Are in Dispute ("SoDF") 13, 52); (2) lack of checks and balances in disclosure process (SoDF 47, 51); (3) lack of understanding by senior management as to who had access (SoDF 53); (4) lack of basic training as to confidentiality procedures (SoDF 50); (5) lack of supervision as to confidentiality procedures (SoDF 47, 51); and (6) failure to heed senior administrators' concerns.

(*Id.*) In other words, NOM insists that IRS procedures were so inherently deficient during the relevant time period that the disclosure must be the result of gross negligence. The Court finds this argument unconvincing.[3]

---

[3]  In its reply, the Government argues that the Court should exclude this claim of gross negligence because it was never identified during discovery. (Gov't's Reply [Dkt. 77] at 5-6 (citing Fed. R. Civ. P. 37).) The Court agrees that NOM failed to disclose this theory of the case in violation of Rule 37, and thus exclusion is appropriate. *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* No. 100-1898, 2014 WL 494522, at *2-4 (S.D.N.Y. Feb. 6, 2014) (excluding plaintiffs' theory of liability under Rule 37 because it was not disclosed in response to defendants' discovery requests); *Rambus, Inc. v. Infineon Techs. AG,* 145 F. Supp. 2d 721, 727 (E.D. Va. 2001) (noting that Rule 37(c)(1) "automatically imposes the preclusion sanction unless the noncomplying party can show that there is substantial justification for the failure to make the disclosure and that the failure to

Even taking the deficiencies noted by NOM at face value, no reasonable jury could conclude that the procedures in place were so fundamentally flawed as to constitute gross negligence.  It is undisputed that the IRS restricted access to confidential material and mandated that all employees redact donor information before disclosing a Form 990.  (Gov't's Mem. at 7; Pl.'s Opp'n at 7.)  The IRS's attempt to delete confidential information demonstrates the "agency's consideration of and concern for plaintiff's privacy interests" such that its actions cannot be labeled wanton or reckless. *Sterling v. United States,* 826 F. Supp. 570, 572 (D.D.C. 1993). Although the IRS has since changed its procedures to avoid the very circumstances of this case, (Pl.'s Opp'n at 10-12), its prior system falls far short of gross negligence under any definition of the term.  *See Sullivan v. Veterans Admin.,* 617 F. Supp. 258, 259-62 (D.D.C. 1985) (finding that the defendant-agency did not act intentionally or with "flagrant[] disregard [of] an individual's rights" in releasing a report that "inadvertently" included one instance of confidential information because "[w]hile the [agency] was not completely successful in deleting all the personally identifiable references to plaintiff, its attempt to do so demonstrates that

---

disclose was harmless").  Nevertheless, because this argument is a nonstarter, the Court will address the merits below.

agency's consideration of and concern for plaintiff's privacy interests"); *Scrimgeour,* 149 F.3d at 321-26 (ruling that agency employees were not grossly negligent in releasing confidential information although the requests for such information were facially flawed); *Jones v. United States,* 207 F.3d 508, 509-12 (8th Cir. 2000) (IRS agent's tip of impending raid to confidential informant, who informed a television station, did not constitute gross negligence). This conclusion is confirmed by the fact that, other than this case, there is no record of a RAVIS clerk failing to redact a Schedule B. (Gov't's Mem. at 9.) Furthermore, adopting NOM's position would imply that any inadvertent disclosure prior to 2011 was grossly negligent solely by virtue of the IRS's procedures. This view is not borne out by the case law.

Finally, NOM's argument that summary judgment is inappropriate because the existence of punitive damages is inherently "a factual issue" misses the mark. (Pl.'s Opp'n at 12.) Contrary to NOM's position, summary judgment is not altogether precluded on issues that are typically questions of fact for the jury. *See Hanover Ins. Co. v. N. Bldg. Co.*, No. 13-2675, 2014 WL 1810586, at *6 (7th Cir. May 8, 2014) ("Legal damages, like liability, can be determined via the summary judgment mechanism."); *Kirbyson v. Tesoro Ref. & Mktg. Co.,* 795 F. Supp. 2d 930, 947 (N.D. Cal. 2011) (granting summary judgment

17

on punitive damages claim based on lack of evidence); *Bhandari v. VHA Sw. Cmty. Health Corp.*, No. CIV 09-0932 JB/GBW, 2011 WL 1336512, at *19 (D.N.M. Mar. 30, 2011) (same).  Summary judgment is appropriate on a claim for punitive damages where, as is the case here, the plaintiff has failed to carry his burden of producing sufficient evidence to create a triable issue of fact and only one conclusion is possible from the record.  *See Nelson v. Lake Charles Stevedores, L.L.C.,* No. 2:11-CV-1377, 2014 WL 1339827, at *3-8 (W.D. La. Apr. 2, 2014) (granting defendant's motion for summary judgment as to plaintiff's request for punitive damages where "there is no set of circumstances under which the plaintiff could recover").

NOM has made no showing from which a reasonable jury could find that the disclosure of its Schedule B was the result of willfulness or gross negligence.  NOM, therefore, is not entitled to recover punitive damages, and the Court will grant the Government's motion with respect to this claim.

### C. Inspection of NOM's Tax Return Information

Apart from the disclosure of its Schedule B discussed above, NOM claims that it is "entitled to statutory and actual damages, or punitive damages, [because] its return information was unlawfully inspected." (Pl.'s Opp'n at 15.)  According to NOM, "[t]he record evidence demonstrates that various IRS agents [impermissibly] inspected NOM's 2008 Schedule B (original and

amended versions) prior to and immediately after the unlawful disclosure was publicized[.]" (*Id.*)  The Government has moved for summary judgment as to this claim, arguing that NOM has failed to produce sufficient evidence showing that these inspections were unauthorized.  (Gov't's Mem. at 16.)

It is uncontested that § 7431 provides for civil liability when an IRS employee impermissibly inspects a taxpayer's return information, and according to IRS records, the following employees accessed NOM's 2008 Schedule B on the dates noted:

- Wendy Peters            01/21/11
- Connie Peek             04/05/12 (twice)
- Sherry Whitaker         04/13/12 (twice)
- Kathi Palmer            04/05/12
- Unidentified Manager    04/13/12 (twice)
- Laurice Ghougasian      04/05/12

(Pl.'s Opp'n at 17.)  NOM argues that "whether these inspections were authorized . . . is a question of disputed fact" that precludes summary judgment on this issue.  (*Id.* at 15.)  For the reasons set forth below, the Court disagrees.

NOM bears the burden of proof as to this issue.  *See Flippo v. United States,* 670 F. Supp. 638, 641 (W.D.N.C. 1987) ("In order for the Plaintiff to prevail under Section 7431(a)(1) he must show by a preponderance of the evidence . . . that the disclosure was unauthorized[.]").  Thus, in response to the Government's motion for summary judgment, NOM was required to

proffer evidence from which a trier of fact could reasonably find that these inspections were unauthorized. *See Celotex,* 477 U.S. at 323–25. NOM has again failed to meet its burden.

With regard to the 2011 inspection, NOM claims that Peters' authority is in dispute because there is nothing before the Court indicating that she accessed NOM's Schedule B in response to a proper third-party request. (Pl.'s Opp'n at 17 ("The Government's argument that Ms. Peters' inspections of NOM's 2008 Schedule Bs were authorized depends on its unsubstantiated assumption that Mr. Meisel specifically requested copies of NOM's 2008 Schedule Bs. . . . Yet the Government's assumption finds no support in the record.").) In essence, NOM asks the Court to infer that Peters lacked authority based on the absence of a complete audit trail regarding her actions and the specifics of Meisel's request. (*Id.*) This argument is unpersuasive. No reasonable jury could find in NOM's favor based solely on this negative inference when the remaining evidence overwhelmingly indicates that Peters inspected the return while performing her official IRS duties. (*See* Gov't's Mem. at 7–8.) To find that NOM could prevail from this scintilla of evidence would require "the building of one inference upon another," which is not appropriate under Rule 56. *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Accordingly, the Court will grant the Government's motion with respect to the

2011 inspection.  *See Hughes,* 48 F.3d at 1384 (noting that to avoid summary judgment, the party who bears the ultimate burden of proof at trial "must present evidence from which a rational jury might" find in their favor).

The record is equally deficient concerning the remaining inspections.  Citing to a single line in an email obtained during discovery, NOM argues that there is "a disputed question of fact whether some, all or none of these inspections were truly for tax administration purpose or were instead out of mere curiosity."  (Pl.'s Opp'n at 17-18.)  The email at issue is authored by David Hamilton, the SEIN database manager, and it reads in full:

> FYI, it looks like the On-Line-SEIN audit system works.  The article linked below talks about an illegal disclosure of an unredacted return to a web site.  Even though the watermark was crudely removed, the tracking number was obtained by examining the under-layers of the PDF. Querying the Access_Audit table for the return id showed 6 users had accessed the return and one of the tracking numbers matched the one that was removed.  The other 5 users were TEGE higher ups taking a look once the disclosure was reported in the press.
>
> Yay! Something worked the first time!

(Pl.'s Ex. 7.)  The Court finds this single email insufficient to create a material issue of fact as to whether the remaining inspections were unauthorized.  *See Reese v. Nat'l R.R.*

21

*Passenger Corp.,* No. CIV. A. 96–109–C, 1999 WL 195729, at *2 (W.D. Va. Mar. 26, 1999) (granting summary judgment where plaintiff's opposition relied "on the thin reed of a single answer to an interrogatory").  The rest of the email chain, which NOM naturally fails to address, confirms that each of the individuals identified above, outside of Peters, were somehow involved in the IRS's response to the disclosure.  (*See* Pl.'s Ex. 7.)  The IRS's internal investigation report further confirms that all of the inspections performed in April 2012 were done as part of the IRS's internal response.  (Pl.'s Ex. 3 at 5 ("STACY FISHER added that besides the accesses that she and her associates have performed in April 2012, no other IRS employees have accessed the NOM's 2008 account[.]").)  Based on this evidence, no reasonable fact finder could conclude that the inspections at issue were anything but official tax administration business.  *See* 26 U.S.C. § 6103(h)(1) (permitting the "inspection by or disclosure [of returns] to officers and employees of the Department of the Treasury whose official duties require such inspection or disclosure for tax administration purposes").

Accordingly, because there is no evidence before the Court upon which NOM could prevail, the Court will dismiss its unlawful inspection claims.

**D. Actual Damages**

Section 7431(c) provides that a taxpayer who establishes that his return information was disclosed in violation of § 6103 has a choice between either statutory damages of $1,000 for "each act of unauthorized disclosure" or "the sum of his actual damages plus, in the case of a willful disclosure or a disclosure which is the result of gross negligence, punitive damages."  26 U.S.C. § 7431(c).

In this case, NOM is claiming the following actual damages: $12,500 in attorneys' fees in connection with its response to the Karger lawsuit discussed above; and $46,086.37 in attorneys' fees expended during its efforts to determine the source of the disclosure and prevent further dissemination of its Schedule B.  (Gov't's Mem. at 9-10; Pl.'s Opp'n at 7.)  The Government claims that "[n]one of these alleged damages are recoverable" because, as a matter of law, "the actual damages claimed were not sustained 'as a result of' the IRS' inadvertent disclosure, but rather were the result of the intervening actions of third parties[.]"  (Gov't's Mem. at 24.)

The case law is admittedly sparse regarding what is necessary to establish actual damages under § 7431(c).  Each court to have addressed this issue, however, has uniformly concluded that that the common law elements of causation – actual and proximate cause - must be proven.  *See, e.g., Jones*

23

*v. United States,* 9 F. Supp. 2d 1119, 1137 (D. Neb. 1998); *see also Paroline v. United States,* __ U.S. __, 134 S. Ct. 1710, 1720 (2014) (reciting the common maxim that a plaintiff must prove both proximate cause and actual cause to recover damages that are "a result of" a particular defendant's conduct).

The Supreme Court's recent discussion of causation in *Paroline* is particularly helpful here:

> As a general matter, to say one event proximately caused another is a way of making two separate but related assertions. First, it means the former event caused the latter. This is known as actual cause or cause in fact. The concept of actual cause "is not a metaphysical one but an ordinary, matter-of-fact inquiry into the existence . . . of a causal relation as laypeople would view it."
>
> Every event has many causes, however, and only some of them are proximate, as the law uses that term. So to say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result. The idea of proximate cause, as distinct from actual cause or cause in fact, defies easy summary. It is "a flexible concept" . . . that generally "refers to the basic requirement that . . . there must be 'some direct relation between the injury asserted and the injurious conduct alleged[.]'" . . . The concept of proximate causation is applicable in both criminal and tort law, and the analysis is parallel in many instances. Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct. . . . A requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal

24

> link between conduct and result is so
> attenuated that the consequence is more
> aptly described as mere fortuity.

134 S. Ct. at 1719 (citations omitted).  With these principles

in mind, the Court will turn to the specific questions raised in

the Government's motion.  In general, the Government argues that

the NOM has failed to prove both actual and proximate cause.

(Gov't's Mem. at 24.)

     The Court has little trouble concluding that the

unlawful disclosure of NOM's Schedule B was the actual cause of

its claimed damages.  Actual cause, or cause in fact, requires

"pro[of] that the wrongful act in fact caused the harm; that is,

the plaintiff must prove that 'but for' the wrongful act, the

harm would not have occurred." *Jones,* 9 F. Supp. at 1138.  The

Government concedes that it unlawfully disclosed NOM's Schedule

B to a third-party.  (Gov't's Mem. at 2.)  The damages noted

above were plainly a direct result of this disclosure.  For

example, it is clear beyond question that the disclosure gained

significant media coverage that resulted in NOM retaining

counsel to investigate the leak.  In other words, but for the

disclosure, NOM would not have incurred the costs it now seeks

through this action.  *See Paroline,* 134 S. Ct. at 1722 ("The

traditional way to prove that one event was a factual cause of

another is to show that the latter would not have occurred 'but

for' the former.  This approach is a familiar part of our legal

tradition[.]" (citation omitted)).  The Government's argument

that NOM cannot pass the "but for" test because it willingly

incurred these expenses is unsuccessful.  (*See* Gov't's Mem. at

27.)  This argument has no relation to the Court's inquiry,

which simply asks would the injury have occurred without the

defendant's conduct.  *See Eggleston v. Wal-Mart Stores East, LP,*

No. 3:05 CV 721, 2006 WL 1050654, at *3 (E.D. Va. Apr. 20,

2006).  The answer in this case, without question, is no.

The issue of proximate cause is a closer call simply

by virtue of its nebulousness.  As noted above, proximate cause

is a "flexible concept" not easily defined or implemented.

*Paroline,* 134 S. Ct. at 1719.  Generally, proximate cause refers

to the notion that there must be "some direct relation between

the injury asserted and the injurious conduct alleged."  *Holmes*

*v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268 (1992).

Proximate cause is designed to "preclude liability in situations

where the causal link between conduct and result is so

attenuated that the consequence is more aptly described as mere

fortuity."  *Paroline,* 134 S. Ct. at 1719 (citation omitted).

The proximate cause inquiry is "often explicated in terms of

foreseeability or the scope of the risk created by the predicate

conduct."  *Id.*  Boiled down, "the plaintiff must prove that the

harm was a 'reasonable and probable [foreseeable] consequence'

of the wrongful act; that is, the plaintiff must prove that,

considering other potential causes, it is sensible to impose liability upon the defendant." *Jones,* 9 F. Supp. at 1138 (citations omitted); *see also Goddard v. Protective Life Corp.,* 82 F. Supp. 2d 545, 554 (E.D. Va. 2000) ("The question of proximate cause is generally a question for determination by a jury. . . . Such a determination becomes a matter of law if undisputed facts are susceptible of only one inference." (citation omitted)).

Having considered the parties' arguments, the Court is persuaded that the harms for which NOM seeks damages were both foreseeable and within the scope of risk associated with the IRS's conduct. Congress deliberately exempted from disclosure the names and addresses of an organization's donors. *See* 26 U.S.C. § 6104(b). This choice demonstrates its understanding – one that is assumed by the IRS – that such information, if disclosed publicly, could expose an organization and its donors to a multitude of harms. *See Diamond v. United States,* 944 F.2d 431, 434 (8th Cir. 1991) ("The need to minimize disclosures is particularly important when it is remembered 'that our voluntary assessment system of tax action is in large measure dependent upon the realization of a taxpayer's expectation that the information required of him for this purpose would be kept confidential.'" (citation omitted)); *Johnson v. Sawyer,* 640 F. Supp. 1126, 1132 (S.D. Tex. 1986) ("Congress enacted . . .

27

[Section] 6103 to protect taxpayers' reasonable expectation that information submitted to the IRS would remain confidential."). As such, it was certainly foreseeable that releasing NOM's Schedule B to a member of the media could result in its publication, and that NOM would take legal action to prevent further harm.  While the Government may not have predicted the precise conduct at issue here, one cannot reasonably conclude that NOM's legal expenses were unforeseeable, and that is all the element of proximate cause requires.  *See Griggs v. Firestone Tire & Rubber Co.,* 513 F.2d 851, 861 (8th Cir. 1975) ("[T]he law does not require precision in foreseeing the exact hazard or consequence which in fact transpires; it is sufficient if what occurred was one of the kind of consequences which might reasonably be foreseen." (citation and internal quotation marks omitted)).

The case *Jones v. United* States, 9 F. Supp. 2d 1119 (D. Neb 1998), supports this conclusion.  In *Jones,* an IRS agent alerted a confidential informant about an upcoming search warrant raid on a taxpayer who was under investigation.  *Id.* at 1123-25.  The informant then notified the media, which was out in full force for the execution of the warrant, causing significant harm to the taxpayer's reputation and business.  *Id.* at 1128.  Following a bench trial, the court held that both elements of causation were met.  *Id.* at 1137-44.  *Jones* not only

28

illustrates the general position that proximate cause is an issue of fact often suited for trial, but also that misuse of taxpayer information by third parties is "one of the kind of consequences" of an unauthorized disclosure "which might reasonably be foreseen."  *Id.* at 1144.

    The Government's claim that the above damages are unrecoverable because they "arise out of acts by non-IRS personnel, several steps removed from any conduct by the IRS" is unconvincing.  (Gov't's Mem. at 26.)  This argument ignores relevant proximate causation issues, namely, whether the intervening actions were a reasonable and probable consequence of the disclosure.  *See Rawl v. United States,* 778 F.2d 1009, 1015-16 (4th Cir. 1985).  The independent actions of Meisel, the HRC, and others cannot immunize the IRS from responsibility in this case given it was clear that publication was likely and the harms claimed (*i.e.* legal expenses) were certainly a foreseeable consequence of publication.  The fact that a third-party was involved in this chain of events does not foreclose finding proximate cause on these facts.  *See Jones,* 9 F. Supp. 2d at 1137-44.[4]

---

[4]  While the main thrust of the Government's argument is directed at causation, it also briefly claims that attorneys' fees, such as those expended here, are not recoverable as actual damages under § 7431(c).  (*See* Gov't's Mem. at 27.)  The Government does not cite any authority in support of this position, and the Court has found nothing that remotely suggests this argument holds water.  *See Jones,* 9 F. Supp. 2d at 1149 ("Linguistically,

The Government's position that it is not responsible, as a matter of law, for the costs associated with the subsequent misuse of NOM's confidential taxpayer information is untenable on the facts presented.  Accordingly, the Court will deny the Government's motion as to this issue.

**E. Mitigation**

Lastly, the Government argues that NOM "should not be allowed to recover the amounts it seeks because it has fully mitigated / offset any 'damages.'"  (Gov't's Mem. at 28.)  According to the Government, NOM has received "at least $75,000 in aggregate donations from donors who had never donated to NOM before March 30, 2012 – the date [it] learned of the disclosure."  (*Id.* at 28-29.)  Thus, "it would be incongruous with fundamental principles of law to allow Plaintiff to recover damages when it has already mitigated and offset those alleged damages by soliciting and receiving donations using the instant lawsuit and the very action it has complained about."  (*Id.* at 29.)

The Court will not grant summary judgment as to this issue.  Putting aside the parties' disagreement as to the collateral source rule, *see Sloas v. CSX Transp. Inc.,* 616 F.3d 380, 389 (4th Cir. 2010) ("The collateral source rule holds that

there is no limitation on the reach of 'actual' damages, so long as that damage is 'something that . . . exists in fact.'" (citation omitted )).

'compensation from a collateral source should be disregarded in assessing tort damages.'" (citation omitted)), there is a continuing factual dispute as to whether the cited contributions were caused by the disclosure, and if so, in what amount. The Government essentially asks this Court to decide that every donation NOM received during 2012 occurred as a result of the disclosure. The record, however, is insufficient to reach this conclusion as a matter of law. *See Hylind v. Xerox Corp.,* 481 F. App'x 819, 824 (4th Cir. 2012) ("The defendant bears the burden of demonstrating that it is entitled to an offset."). The only evidence on this issue is NOM's admission that 2012 was a record year for donations and it received $46,086.37 from solicitations that referenced the disclosure. (Gov't Mem. at 28-29.) These facts alone are insufficient, as they do not confirm that the contributions were caused by the disclosure as opposed to some other impetus.

Accordingly, the Court will deny the Government's motion to the extent it seeks a judgment concerning mitigation.

## IV. Conclusion

For the reasons stated above, the Court will grant the Government's Motion for Summary Judgment and dismiss NOM's unlawful inspection claim, (Compl. ¶¶ 110-17), and its request for punitive damages, (Compl. ¶¶ 120, 122, 134). The Court will deny the Government's motion in all other respects. In light of

this ruling and the Government's admission that it improperly

released the Schedule B, (*see* Gov't's Mem. at 2), the only

issues remaining for trial concern NOM's damages from this

single disclosure.

      An appropriate order will follow.


|  | /s/ |
| --- | --- |
| June 3, 2014 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |